# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**MARQUEZ B. PERRY,**                              CASE NO. 3:22 CV 688

     Plaintiff,

     v.                                              JUDGE JAMES R. KNEPP II

**WARDEN HAROLD MAY, et al.,**

     Defendants.                                     **MEMORANDUM OPINION AND ORDER**


## INTRODUCTION

Currently pending in this *pro se* 42 U.S.C. § 1983 action are a Motion for Partial Judgment on the Pleadings filed by Defendants Harold May, Kelly Mendoza, Michael Jenkins, Ciara Buck, Terence Brown, James Brown, David Robinson, James Hobbs, and Penney Abbott (Doc. 49) and a Motion for Judgment on the Pleadings filed by Defendants Earlena Shepard, Karrie Hupka, and interested party State of Ohio (Doc. 52). Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons discussed below, the Court grants in part and denies in part both motions.[1]

## BACKGROUND

Plaintiff Marquez Perry is a state prisoner who, at the time of filing this case in April 2022, was housed at Toledo Correctional Institution ("TCI"). *See* Doc. 1. Plaintiff's claims against Defendants stem from their alleged responses (or lack thereof) to violence inflicted upon Plaintiff by other inmates. Plaintiff describes this background of violence in a "sworn statement" attached to his Amended Complaint. *See* Doc. 27-1. That background and his allegations against Defendants, as relevant to the currently pending motions, are as follows.

---

1. The Court also denies as moot Plaintiff's Motion to Compel Discovery (Doc. 55).

Facts Related to Deliberate Indifference Claims

*Events Prior to 2021*

Plaintiff alleges that in July 2019, while he was housed at Warren Correctional Institution ("WCI"), he filed an allegation that he had been raped by inmate Kevin Freeman, a "Blood gang member." (Doc. 27-1, at 2-3).[2] He states he testified to a grand jury about the rape in October 2019. *Id.* at 2. In December 2019, Plaintiff alleges the rape allegation "was substantiated by the prison investigators" and an "institutional separation" between Plaintiff and Freeman was put in place. *Id.* at 3. In "late 2019[,]" he began experiencing retaliation from other alleged gang members for reporting the rape. *Id.* While at WCI, this included an assault in November 2019 by other inmates in which he was cut on the head, had a bloody nose, and suffered a "near broken finger[.]" *Id.* at 2-3.

In March 2020, Plaintiff was transferred to Southern Ohio Correctional Facility ("SOCF"). *Id.* In October of that year, he "got into a physical altercation with a gang member[.]" *Id.* at 4. On January 8, 2021, "a Blood gang member attempted to assault" Plaintiff. *Id.* Plaintiff alludes to, but does not expressly state, that inmates were attempting to extort him for money at this time. *Id.* at 4-5.

---

2. In deciding a motion to dismiss or motion for judgment on the pleadings, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The Court may therefore consider Plaintiff's "Sworn Statement" or Declaration, as it was attached to his Amended Complaint.

*2021*

In January 2021, Plaintiff was transferred to Toledo Correctional Institution ("TCI"). *Id.* at 4. Freeman was also incarcerated at TCI. Freeman allegedly learned Plaintiff was at TCI in April 2021. *Id.* at 5.

Plaintiff states he emailed Warden May in April 2021 to inform him that he was housed in the same institution as Freeman, despite the institutional separation order, and told May that Freeman "was having Blood members assault [him] and harass [him]and attempt to extort [him] at SOCF and that at [TCI] [his] [safety] would be in more danger" if he remained in general population. *Id.* Plaintiff also asserts he "informed" Robinson about the institutional separation in April 2021 and that he "was the victim of assaults and harassment" and would be in further danger from gang members based on his prior report of assault. *Id.* Plaintiff further states he spoke to Robinson again in June and July, and "warned him" that Plaintiff's safety was in danger because his rapist was housed in the same institution. *Id.* at 6.

In June and July 2021, Plaintiff states he "got into multiple verbal altercations with the Blood gang members about money they wanted [Plaintiff] to pay them." *Id.*

In July 2021, Plaintiff alleges he was physically and sexually assaulted by another inmate, last name "Tate," while taking a shower. *Id.* at 8. After this assault, Plaintiff received medical treatment – most notably, "several stitches in [his] face[.]" *Id.*; *see also* Doc. 27, at 8, 24-25 (describing assault, including seven stitches).

Plaintiff further asserts he was assaulted in August 2021, when he was punched several times while walking to lunch. (Doc. 27-1, at 12).

Plaintiff states that in July and August 2021, he told May he had been "assaulted multiple times and was being threatened with retaliation for reporting [his] assaults to staff[.]" (Doc. 27, at

3). Plaintiff further states that, following the above-described assault while walking to lunch, he filed for protective custody and informed Robinson and May "of the [d]angers that being in [general population] posed on his safety" and "of the assaults and harassment at [his] previous institution." (Doc. 27-1, at 12).

Plaintiff further asserts that in August 2021, during the appeal of the denial of his protective custody request, he told Shepard "he had been assaulted several times." (Doc. 27, at 27).

In September 2021, Plaintiff alleges he was assaulted in his cell by three gang members; he states the assault resulted in a bloody nose, cuts, bruises, and bleeding "from multiple places on [his] face and head." (Doc. 27-1, at 13-14).

Plaintiff asserts that, after the above-described assault, he "emailed Defendant Mendoza and told her what happened." *Id.* at 14.

In September 2021, Plaintiff alleges gang members began making death threats against him. *Id.* Plaintiff began refusing to leave his cell for meals for fear of being attacked. *Id.* at 15. Plaintiff states prison staff placed him on "mental health watch" and "suicide watch[.]" *Id.* at 19. Plaintiff alleges that, during this "watch" period, he "was sprayed with mace and shot with mace pellets on three separate occasions[,]" which resulted in burns to his throat and skin and welts on his head. *Id.* Plaintiff does not identify who sprayed or shot him with mace.

Also, in September 2021, during the appeal of a denial of a protective custody request, Plaintiff alleges he told Hupka "that he suffered several assaults since his 1st [protective custody] hearing and explain[ed] that he was in danger of more assaults." (Doc. 27, at 28).

In October 2021, Plaintiff represents he was assaulted twice. First, he alleges he was punched from behind, knocked unconscious, and then kicked in the face while walking back to his cell from dinner, causing a swollen jaw and three broken teeth. (Doc. 27-1, at 14-15). Second, he

4

asserts he was assaulted inside his cell by a gang member who "came into the cell and beat [him] very badly and assaulted [him] several times" while another gang member blocked the door; this resulted in rib pain (Plaintiff "believe[d] [his] rib was broken"), and "bleeding from multiple places." *Id.* at 16.

Also in October 2021, Plaintiff wrote May a letter informing him that he "was once again assaulted and that he would be at risk of more assaults" if he remained in general population. *Id.* He states he informed May "of all [his] assaults and informed him of the injuries suffered[.]" *Id.* at 17. Plaintiff again filed for protective custody that month, but May denied it. (Doc. 27, at 4-5). Plaintiff alleges this resulted in his period of "mental health observation [and] suicide watch" and the occasion upon which he was sprayed and shot with mace by an unidentified individual. *Id.* at 5. Also in October 2021, Plaintiff alleges he informed Unit Manager Penney Abbott that he "was incarcerated under conditions that pose[d] a substantial risk to his health and safety[,]" and contends Abbott ignored that risk. *Id.* at 18-19.

In November 2021, Plaintiff states he "again explained about [his] assaults" to May. *Id.* at 16-17. He again requested protective custody. *Id.* at 17.

In a December 2021 appeal of that protective custody request, Plaintiff "again explained" to Hupka "the assaults [he] already suffered and the injuries as well as the threats to [his] safety." (Doc. 27-1, at 18).

*2022*

In January and/or February 2022, Plaintiff states he again told Mendoza, Abbott, Deputy Warden of Operations James Hobbs, and Major James Brown of the recent attacks against him, stated he "was incarcerated under conditions which pose[d] a substantial risk to his [health] and safety[,]" and asked to be placed in protective custody; he states these Defendants ignored this risk

and kept him in the prison's general population. (Doc. 27, at 15-19). Plaintiff also alleges May was responsible for denying Plaintiff's request for protective custody at this time (his third request). *Id.* at 36-37.

Plaintiff asserts that in February 2022, again during the appeal of a protective custody request, Plaintiff informed Hupka "of his many physical and sexual assaults" and "of the many retaliational assaults by gang members for reporting his alleged rape and the many assaults." *Id.* at 30.

Plaintiff alleges he was physically assaulted by gang members in March 2022, when he was "beaten up two times in a week period." (Doc. 27-1, at 21-22). He asserts he was "beaten up in a cell in retaliation for reporting these assaults . . . resulting in injuries to his face and head and hands and the loss of blood." (Doc. 27, at 31).

He further alleges that in April 2022, he was assaulted while walking to dinner; he was knocked to the ground and punched multiple times. *Id.* .

In May 2022, Plaintiff was transferred back to SOCF. *Id.* at 22. He alleges assaults by other inmates continued, particularly when in, or headed to, the facility's dining room. (Doc. 27-1, at 22). In June 2022, he alleges "gangs" told him to pay them $600 "or be in danger of more assaults" and to "never leave [his] unit to go eat unless [he] [paid] the money." *Id.* In September 2022, Plaintiff states he "was forced to pay money to gang members to avoid another assault." *Id.* at 23. In November 2022, Plaintiff states he "was threatened by [a] Blood gang member [with assault] if [he] didn't keep [his] mouth shut." *Id.*

Facts Related to Retaliation / Equal Protection / Due Process Claims

In July 2021, Plaintiff states he made internal complaints and filed a lawsuit against Robinson. (Doc. 27, at 9-10). Shortly thereafter, Robinson "began stopping [P]laintiff in the

hallways" to search and "aggressively" pat him down without reason. *Id.* at 10. During the same month, Plaintiff made an internal complaint and filed a lawsuit against Mendoza. *Id.* at 13. Shortly thereafter, Plaintiff alleges that, while passing Plaintiff in the hall, Mendoza said loudly to another staff member, "I love inmate Tate because he fucks people up." *Id.* Plaintiff identifies Tate as the inmate who physically and sexually assaulted him in the shower in July 2021, but does not specify whether this comment by Mendoza occurred before or after that incident.

Plaintiff additionally alleges that in July 2021, he filed an internal complaint against Institutional Inspector Michael Jenkins. *Id.* at 22. Three days later, Plaintiff states Jenkins complained about the internal complaint and "spoke to [Plaintiff] harshly." *Id.* The next day, Plaintiff alleges Correctional Officer Ciara Buck entered his cell, "shook [it] down," threw Plaintiff's property on the floor, and took his "phone tablet" from him. *Id.* Plaintiff states that, although this device was his own, he "received a false conduct report" from Buck for possessing another inmate's device, which resulted in his loss of phone and commissary privileges. *Id.* at 22-23. He also states his loss of the device meant he "was not able to pay [his] extortion bill to the Bloods" and was subsequently assaulted by Tate. *Id.* at 24.

Plaintiff states his report of the July 2021 physical and sexual assault by Tate resulted in a Prison Rape Elimination Act ("PREA") investigation, under which Plaintiff had the right "to be given 30[-]day investigation check[-]ups . . . to ensure [P]laintiff was not being retaliated against[,]" which May failed to perform. *Id.* at 6. Plaintiff alleges this failure led to the retaliatory attacks he suffered in August, September, and October 2021. *Id.* at 7. He also alleges he was placed in solitary confinement for a combined total of 180 days "[a]s a result of this[.]" *Id.* Plaintiff also ascribes this failure to perform the PREA investigation "check[-]ups" to PREA Investigator

Terence Brown, who Plaintiff states interviewed him about the July 2021 assault by Tate. *Id.* at 19-21. He further alleges May failed to fulfill his duties under the PREA. *See* Doc. 27, at 7.

Procedural History

Plaintiff filed his Amended Complaint on January 25, 2023. *See id.* It referred to Defendants Shepard and Hupka as Jane Doe #1, Jane Doe #2, and Jane Doe #3. *Id.* at 27-31. On February 16, 2023, this Court construed Plaintiff's "Motion to alert the court to the names of Jane Doe #1, Jane Doe #2, and Jane Doe #3" as a motion to substitute and granted it; Shepard was substituted for Jane Doe #1, and Hupka was substituted for Jane Does #2 and #3. Shepard and Hupka were served on February 28, 2023. *See* Docs. 36, 38.

Plaintiff's Amended Complaint also contained claims against John Does #1, 2, and 3. (Doc. 27, at 2). They remain unnamed and unserved.

Plaintiff's original Complaint made claims against a defendant identified as "Lieutenant Paisley." *See* Doc. 1. Plaintiff then moved to remove Paisley. *See* Doc. 8. Plaintiff's Amended Complaint added this defendant back as "Sergeant Paisley." (Doc. 27, at 2). Defendants represent that this is the same individual. There is no evidence on the docket that Paisley has ever been served in this case.

Plaintiff's Amended Complaint included claims against SOCF Deputy Warden of Operations Cynthia Davis. *Id.* This Court previously granted Davis's Motion to Dismiss the claims against her. *See* Doc. 48.

This Court also previously granted a motion by Abbott, Brown, Brown, Buck, Hobbs, Jenkins, May, Mendoza, and Robinson to stay further discovery pending the outcome of the instant Motions for Judgment on the Pleadings. *See* Doc. 66. After the Motion to Stay, but before this Court's Order granting that motion, Plaintiff filed a Motion to Compel Discovery. *See* Doc. 55.

On March 29, 2024, the Court denied Plaintiff's Motion for Leave to Amend the Amended Complaint. *See* Doc. 62. Plaintiff thereafter filed a "Notice of Affidavit to Elaborate on his [Amended] Complaint." *See* Doc. 68. He states it "should be considered as part of his pleadings as a *pro se* litigant." *Id.* at 1. Plaintiff further attaches a sworn declaration to one of his opposition briefs. *See* Doc. 69-1. Because the Court denied Plaintiff leave to further amend his Complaint, it will not consider these documents in which he purports to elaborate on his Amended Complaint.[3]

## STANDARD OF REVIEW

A motion for judgment on the pleadings under Federal Civil Rule 12(c) is reviewed under the same standard as a Rule 12(b)(6) motion. *Coley v. Lucas County*, 799 F.3d 530, 536–37 (6th Cir. 2015). When deciding either motion, this Court presumes all factual allegations in the complaint to be true and makes all reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). A complaint will only survive if it states a plausible claim for relief on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). To do so, the complaint must state factual allegations that allow this Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bates v. Green Farms Condominium Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020) (citing *Iqbal*, 556 U.S. at 678). A complaint is not required to contain "detailed factual allegations," but must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

---

3. The same is true for facts Plaintiff presents in his opposition briefs that are not included in his Amended Complaint.

**DISCUSSION**

Plaintiff brings claims of deliberate indifference / failure to protect in violation of the Eighth Amendment against May, Robinson, Mendoza, Hobbs, James Brown, Terence Brown, Abbott, Shepard, and Hupka. He brings equal protection and/or due process claims under the Fourteenth Amendment against May, Robinson, Terence Brown, Buck, and May. He brings claims of retaliation in violation of the First Amendment against Robinson, Mendoza, Jenkins, and Buck. *See* Doc. 27. Defendants move to dismiss all claims against them. For the reasons discussed below, Defendants' Motions are granted in part and denied in part.

Claims Against Paisley

Defendants contend that any claims against Paisley must be dismissed for lack of service. Plaintiff named Paisley in his original Complaint. (Doc. 1). He never perfected service on Paisley, and in November 2022, asked the Court to "remove him as a Defendant." (Doc. 8). However, in his later-filed Amended Complaint, Plaintiff re-added Paisley. (Doc. 12-1). Plaintiff never perfected service on Paisley. Plaintiff provides no response to Defendants' argument in this regard. *See* Doc. 69. The Court finds Plaintiff has received proper notice of the service deficiency but has not shown good cause which would justify further extending the deadline for executing service on defendant Paisley. As such, all claims against Paisley are dismissed without prejudice for lack of service. *See* Fed. R. Civ. P. 4(m).

Statute of Limitations

Defendants Hupka and Shepard assert all claims against them must be dismissed as barred by the statute of limitations. (Doc. 52, at 6-9).

Plaintiff originally filed suit on April 28, 2022. (Doc. 1). This original complaint contained no claims against Hupka or Shepard. On December 13, 2022, Plaintiff filed a motion for leave to

10

file an Amended Complaint adding claims, including claims against Jane Does #1-3. (Doc. 12); *see also* Doc. 27 (Amended Complaint). On January 12, 2023, Plaintiff filed a "Motion to Alert" the Court that Jane Doe #1 was "Mrs. E. Sheppard of Bureau of Classification" and Jane Doe #2 and #3 was "Mrs. K. Hupka of Bureau of Classification." (Doc. 22).

On January 25, 2023, the Court found Plaintiff's proposed Amended Complaint was an amendment as of right pursuant to Federal Civil Rule 15(a)(1), and thus deemed it filed. (Doc. 26, at 5). On February 16, 2023, the Court issued an order construing Plaintiff's "Motion to Alert" as a motion for leave to substitute, and substituted Sheppard for Defendant Jane Doe #1 and Hupka for Defendants Jane Does #2 and #3.

"[J]udgment on the pleadings under Fed. R. Civ. P. 12(c) is uniquely suited to disposing of a case in which a statute of limitations provides an effective bar against a plaintiff's claim." *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994). A two-year statute of limitations applies to the § 1983 claims asserted in this case. *See Browning v. Pendleton*, 869 F.2d 989, 991 (6th Cir. 1989).

Identifying a named individual in the place of a previously-unidentified Jane Doe defendant "is considered a change in parties, not a mere substitution of parties" and "such amendments do not satisfy the 'mistaken identity' requirement of Rule 15(c)" regarding relation back. *Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012) (quoting *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996)).

As against Shepard and Hupka, Plaintiff alleges deliberate indifference claims. Specifically, he contends Shepard failed to protect him in August 2021 when he appealed the denial of his protective custody request and Shepard denied the request. (Doc. 27, at 27). He similarly contends Hupka failed to protect him when she denied his protective custody appeals in September 2021, December 2021, and February 2022. *Id.* at 28-30.

Although Defendants are correct that a two year statute of limitations applies, and correct in their analysis of Rule 15, the Court finds the statute of limitations does not bar the claims Plaintiff presents against these two Defendants based on their actions from August 2021 to February 2022.

Official Capacity Claims

All Defendants contend that any claims against them in their official capacity are barred by Eleventh Amendment / sovereign immunity. (Doc. 49, at 20-21; Doc. 52, at 16-17). Although Plaintiff's complaint is not clear as to whether he intends to bring his claims against Defendants in their official or individual capacities, Defendants correctly point out that they are immune from any official capacity claims.

A suit against a state official operates as an action against the State itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). The State of Ohio has not waived its sovereign immunity, nor has it consented to civil rights suits in federal court. *Mixon v. Ohio*, 193 F.3d 389, 397 (6th Cir. 1999). Thus, any official capacity claims are barred by sovereign immunity. *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 513-14 (6th Cir. 2021).[4] Given the liberal construction afforded to *pro se* pleadings, however, the Court also construes Plaintiff's Amended Complaint as bringing claims against Defendants in their individual capacities.

_____

4. The Sixth Circuit recently explained that, although "courts have often treated Eleventh Amendment immunity and sovereign immunity as interchangeable . . . as a matter of original meaning, the two are conceptually distinct." *WCI, Inc.*, 18 F.4th at 513. It distinguished immunity under the Eleventh Amendment as sounding in subject-matter jurisdiction and containing a diversity requirement from sovereign immunity which "refers to a state's right 'not to be amenable to the suit of an individual without its consent[,]'" sounds in personal jurisdiction, and does not require diversity. *Id.* at 514 (citing The Federalist No. 81, at 486 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (emphasis omitted)). Here, Plaintiff is housed in an Ohio prison and sues Ohio prison officials. Therefore "[b]ecause the parties are not diverse, sovereign immunity applies, and the Eleventh Amendment, by its plain terms, does not." *Id.*

<u>Respondeat Superior</u>

Defendants additionally contend that *respondeat superior* is not a proper basis for liability under 42 U.S.C. § 1983. *See* Docs. 49, at 11-12; Doc. 52, at 13-14. This is a correct statement of the law. *See Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003). Specifically, Defendants contend that, although the Amended Complaint asserts Defendants had authority to remove him from general population housing or place him in protective control, he does not ever allege who had the authority or responsibility to do so. Plaintiff responds that he seeks only to hold each individual Defendant responsible based on his or her own actions. *See* Doc. 70, at 6-11.

To sufficiently plead a claim under § 1983, a plaintiff must allege "personal involvement." *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (citation omitted); *see also Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) ("To establish a § 1983 . . . claim against a public official in his personal capacity, a plaintiff must show that the official either actively participated in the alleged unconstitutional conduct or implicitly authorized, approved or knowingly acquiesced in the alleged unconstitutional conduct of an offending subordinate.") (internal quotation and citation omitted); *Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

With this principle established and in mind, the Court turns to Plaintiff's individual claims and whether the facts asserted are sufficient to plausibly allege a claim, including the required personal involvement.

<u>Eighth Amendment</u>

The majority of Plaintiff's claims in his Amended Complaint encompass allegations that Defendants acted with deliberate indifference to Plaintiff's safety, in violation of the Eighth Amendment, by taking no action to protect him from attacks from other inmates. Defendants

contend Plaintiff has failed to properly allege facts to support the subjective element of such a claim. *See* Doc. 49, at 10-11; Doc. 52, at 9-13.

To sufficiently plead a § 1983 claim, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or laws of the United States which was (2) caused by a person acting under the color of state law. *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). For the reasons discussed below, the Court finds Plaintiff has plausibly alleged deliberate indifference claims against these Defendants.

Prison officials, such as the defendants named for this claim, have an Eighth Amendment duty to protect prisoners from violence at the hands of other prisoners. *Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021). But "not 'every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994)). Plaintiff must allege, (1) on an objective basis, he was "incarcerated under conditions posing a substantial risk of serious harm," and (2) the prison official acted with "deliberate indifference" to his safety such that the official was "subjectively aware of the risk and failed to take reasonable measures to abate it." *Id.* (internal quotation and citation omitted). A plaintiff satisfies the subjective component by "alleg[ing] facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

Plaintiff therefore must allege facts to support that each individual official was "subjectively aware of the risk" he faced. *Id.* In his Amended Complaint and attached Declaration, Plaintiff describes, with at least some particularity, a few of the instances of violence he allegedly

14

faced from other inmates. He describes a physical and sexual assault in the shower by an inmate with the last name of Tate in July 2021 (Doc. 27-1, at 8); an August 2021 assault in which he was punched from behind while walking to lunch (*id.* at 12); three gang members beating him up "very badly" resulting in a bloody nose, cuts, bruises, and bleeding "from multiple places on [his] face and head" in September 2021; being knocked unconscious and kicked in the face while walking back from dinner in October 2021 (*id.* at 16); and being "beat[en] up very badly and assaulted . . . several times" by a gang member "while another gang member block[ed] the door so [he] could not leave" (*id.*). The Amended Complaint further alleges the assaults Plaintiff suffered were gang members continuing to retaliate against him for reporting his original rape or later attacks. *See generally* Docs. 27, 27-1.

In the Amended Complaint, Plaintiff states with each claim of deliberate indifference that he "warned [the defendant] that [he] was incarcerated under circumstances that pose[] a substantial risk to [his] health and safety and [the defendant] disregarded that risk." (Doc. 27, at 3, 7, 8, 12, 15, 16, 17, 18-19, 20, 27, 28-29, and 30). These statements are merely recitations of the required elements of a deliberate indifference claim, and do not, alone, adequately state such a claim. *See Twombly*, 550 U.S. at 555. However, in reading the Amended Complaint as a whole, the Court finds Plaintiff has plausibly pled facts in support of the subjective element of a deliberate indifference claim against these Defendants. The Court briefly summarizes the specific allegations against each Defendant below.

*May*

Plaintiff states he emailed May in April 2021 to inform him that he was housed in the same institution as his rapist, despite having an institutional separation order, and told May that his rapist "was having Blood members assault [him] and harass [him] and attempt to extort [him] at SOCF

and that at [TCI] [his] [safety] would be in more danger[.]" (Doc. 27-1, at 5). He further states that in July and/or August 2021, he told May he had been "assaulted multiple times and was being threatened with retaliation for reporting [his] assaults to staff[.]" (Doc. 27, at 3). Additionally, in October 2021, he wrote May a letter informing him that he "was once again assaulted and that [he] would be at risk of more assaults if kept in G.P." (Doc. 27-1, at 16). He states he informed May "of all [his] assaults and informed him of the injuries suffered[.]" *Id.* at 17. These statements immediately follow Plaintiff's specific description of two October 2021 assaults. *See id.* at 16-17. Plaintiff further states he "again explained about [his] assaults" to May in November 2021. *Id.* at 17.

*Robinson*

Plaintiff states he told Robinson in April 2021 that the institutional separation between himself and his rapist was being violated, as both were housed at TCI. (Doc. 27-1, at 5). He further alleges he told Robinson that he "[w]as the victim of assaults and harassment and . . . would be in danger of retaliation[.]" *Id.* Plaintiff again spoke to Robinson in June and "warned him about the fact that [his] alleged rapist was in the same institution as [him]self and there was a danger to [his] health or safety[,]" and again in July "about being housed in the same institution as [his] alleged rapist who [he] ha[d] an institution[al] separation on, and how th[at] pose[d] a risk to [his] safety." *Id.* at 6. Finally, Plaintiff alleges that in August 2021, following an assault while walking to lunch, he filed for protective custody and informed Robinson (among other individuals) "of the dangers that being in [general population] posed [to his] safety" and "informed them of the assaults and harassment at [his] previous institution." *Id.* at 12.

16

*Major Brown / Mendoza / Hobbs / Abbott*

In January 2022, Plaintiff alleges he spoke to and wrote to Defendants Major Brown, Mendoza, Hobbs, and Abbott to inform them he "kept being assaulted" and was in danger. (Doc. 27-1, at 20). He "explain[ed] the situation" and asked not to be placed in general population. *Id.* He further spoke to Hobbs "personally" about his safety in January 2022 and wrote a Complaint in February 2022. (Doc. 27, at 16). Plaintiff asserts Hobbs "understood [his] safety concerns[.]" *Id.* He further asserts he spoke to Abbott "multiple times about the danger he would be in while placed in her Unit." *Id.* at 19. He alleges that, in January and February 2022, he "informed Major Brown as the Head of Security that [he] was assaulted several times which resulted in serious medical injuries and . . . that [he] would be at risk of more assaults[.]" *Id.* at 17.

Further, in September 2021, after the above-described assault in his cell, Plaintiff "emailed Defendant Mendoza and informed her what happened." (Doc. 27-1, at 14). In February 2022, he told Mendoza about "his several assaults at the hands of gang members and . . . [that he] would be at further risk of more assaults[.]" (Doc. 27, at 15).

*Investigator Brown*

In October 2021, Plaintiff states he sent a kite to Investigator Brown, among others to "inform them of the situation" and "that [he] was being retaliated against for filing a sexual assault[.]" (Doc. 27-1, at 16).

*Shepard / Hupka*

Plaintiff states in August 2021, during the appeal of the denial of his protective custody request, he told Shepard "that he had been assaulted several times." (Doc. 27, at 27).

Plaintiff alleges that, during the appeal of the denial of a protective custody request in September 2021, Plaintiff told Hupka "that he suffered several assaults since his 1st [protective

custody] hearing and explain[ed] that he was in danger of more assaults." *Id.* at 28. He further alleges that, during a December 2021 appeal, he "again explained the assaults [he] already suffered and the injuries as well as the threats to [his] safety." (Doc. 27-1, at 18). Finally, he asserts that in February 2022, again during the appeal of a protective custody request, Plaintiff informed Hupka "of his many physical and sexual assaults" and "of the many retaliational assaults by gang members for reporting his alleged rape and the many assaults." (Doc. 27, at 30).

The Court finds the above allegations, when the Amended Complaint is read as a whole and with the liberal construction afforded to *pro se* litigants, sufficient to state a claim for deliberate indifference at the pleading stage. The Court finds Plaintiff's allegations regarding various assaults and the reasons therefore, combined with allegations that he informed individual Defendants about those assaults and the reasons therefore and requested protective custody, state a plausible claim that each of these Defendants were subjectively aware of a substantial risk of serious harm.[5] *Cf. Bales v. Turner*, 2016 WL 1241947, at *2 (N.D. Ohio) ("Bales has satisfied [the subjective element] by alleging he told several members of the prison staff other inmates had threatened him for being a snitch, and by alleging the staff responded by taking no action, thus leaving Bales to fend for himself."); *see also Bishop v. Hackel*, 636 F.3d 757, 768 (6th Cir. 2011) ("[A] prison official may be held to be deliberately indifferent to a substantial risk to inmate safety if he is aware that an inmate is vulnerable to assault and fails to protect him.") (citing *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004).

By allowing these claims to proceed, the Court passes no judgment on the merits or the ultimate outcome of this action. To be sure, Plaintiff's allegations of what he *precisely* told each

---

5. Unlike the allegations against Defendant Davis, where "Defendant had no knowledge from Plaintiff of actual violence which had already occurred" (Doc. 48, at 7), Plaintiff specifically alleges he told these Defendants of instances of actual violence.

individual Defendant are somewhat vague. But the standard at this juncture is plausibility, not probability, and the Court finds Plaintiff's pleading surmounts that hurdle. *See Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 363 (6th Cir. 2013) ("Recovery by plaintiffs may not be probable. However, the 'plausibility standard is not akin to a probability requirement;' it requires only something 'more than a sheer possibility that a defendant has acted unlawfully.'") (quoting *Iqbal*, 556 U.S. at 678).

<u>Retaliation</u>

Defendants Robinson, Jenkins, and Buck assert Plaintiff has failed to state a retaliation claim because his allegations of motive and causation are speculative, and he has not identified an adverse action that amounts to a constitutional violation. (Doc. 49, at 12-13). Plaintiff responds that he "has set out a clear case of retaliation by Defendants Jenkins, Buck[,] . . . Paisley, and Robinson and he has alleged all 3 components of a retaliation claim." (Doc. 70, at 18).

A retaliation claim requires a plaintiff to show three things: (1) he "engaged in protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)). However, "the temporal proximity between the [plaintiff's] protected conduct and the official's adverse action" may be sufficient to "create[] an inference of retaliatory motive[.]" *Hill v. Lappin*, 630 F.3d 468, 475-76 (6th Cir. 2010) (citations omitted).

The Sixth Circuit has explained "an adverse action undertaken in retaliation for a prisoner's exercise of his or her First Amendment rights could violate the First Amendment 'if it is capable of deterring a person of ordinary firmness from exercising his or her right to access the courts.'" *Bell v. Johnson*, 308 F.3d 594, 600 (6th Cir. 2002) (quoting *Thaddeus-X*, 175 F.3d at 398). "[W]hile certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.* But the Sixth Circuit has also "cautioned that a blanket rule allowing 'claims for *any* adverse action no matter how minor' would 'trivialize the First Amendment.'" *Young v. Mulvaine*, 2023 WL 5665755, at *3 (6th Cir.) (quoting *Bell*, 308 F.3d at 603-04).

*Robinson*

Plaintiff alleges that, very shortly after he filed several complaints and a lawsuit against Robinson, Robinson came to speak with him, "was visibly upset" with Plaintiff and "began stopping [him] in the hallways and . . . searching [him] and aggressively patting [him] down . . . for no reason on multiple occasions[.]" (Doc. 27, at 10); *see also* Doc. 27-1, at 11 ("I was stop[ped] in the hallway by Defendant Robinson who was visibly upset after I filed a lawsuit and complaints against him and he shook me down in the hallway aggressively multiple times.").

Defendants correctly point out that "[a] single shakedown, unaccompanied by excessive use of force, verbal threats, a pattern of previous questionable shakedowns or other such factors, would not meet the adverse action standard." *Reynolds-Bey v. Harris*, 428 F. App'x 493, 503-04 (6th Cir. 2011) (citing *Tate v. Campbell*, 85 F. App'x 413, 417 (6th Cir. 2003)). In *Reynolds-Bey*, the plaintiff alleged a prison official yelled at him and made an implied threat while conducting a shakedown of his person outside the prison dining hall. *Id.* at 495. The threat involved the use of

a racial slur, which carried an implicit threat of violence. *Id.* at 504. In addition, the official allegedly stated that the plaintiff would "always stay on [his] list[,]" and that the plaintiff "was the one[,]" which could be interpreted as a serious threat. *Id.* The court found these facts presented a "close issue," but held the defendant's conduct was sufficient to deter a person of ordinary firmness from engaging in protected conduct. *Id.* at 503. By contrast, many courts have found subjecting a prisoner to a pat-down search is not sufficiently adverse to support a retaliation claim. *See Yates v. Rogers*, 2018 WL 6629366, at *6 (W.D. Mich.) ("A pat-down search is undoubtedly a 'routine inconvenience' of prison life.") (collecting cases).

Here, the Court finds Plaintiff has simply not pled enough factual detail to plausibly allege that Robinson's pat downs would be sufficient to deter a person of ordinary firmness from engaging in protected contact.

*Jenkins*

Plaintiff asserts that, three days after he filed a grievance against Jenkins, Jenkins "came to [Plaintiff's] cell upset and spoke to [him] harshly and told [him] not to write a complaint against [Jenkins] again." (Doc. 27, at 22).

The Sixth Circuit has concluded verbal harassment and minor threats do not constitute adverse action. *Smith v. Craven*, 61 F. App'x 159, 162 (6th Cir. 2003); *see also Spearman v. Williams*, 2023 WL 7000971, at *4 (6th Cir.) (stating "that verbal abuse, idle threats, and nonphysical harassment of prisoners, standing alone, 'do not constitute the type of infliction of pain that the Eighth Amendment prohibits.' Nor do they constitute an adverse action of constitutional significance") (quoting *Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004)); *Hardy v. Adams*, 2018 WL 3559190, at *3 (6th Cir.) ("The alleged threat by Adams that she would make Hardy's life 'hell' is simply too vague to pass this threshold."). The Court finds Plaintiff's

21

allegations that Jenkins spoke to him harshly and told him (once) not to file any more complaints fall within the category of verbal harassment and minor threats and would not deter a person of ordinary firmness from engaging in protected conduct. As such, Plaintiff has not identified a retaliatory adverse action as it relates to Jenkins.

*Buck*

Plaintiff alleges, the day after Jenkins spoke to Plaintiff, Buck "entered [his] cell and shook [his] cell down and threw [his] hygiene and property all over the floor[;]" she also allegedly "took [his] phone tablet from [him] even though it was registered to [him]." (Doc. 27, at 22).

"[T]he single search of a prison cubicle would not deter a person of 'ordinary firmness' from pursuing constitutional grievances." *Tate v. Campbell*, 85 F. App'x 413, 417 (6th Cir. 2003) (unpublished). But "[a] cell search may be considered sufficiently adverse to satisfy the adverse-action requirement of *Thaddeus-X*, where the search leaves the cell in disarray and results in the confiscation or destruction of materials." *Manning v. Schiebner*, 2024 WL 3579389, at \*6 (W.D. Mich.) (citing *Bell*, 308 F.3d at 606); *see also Clark v. Johnston*, 413 F. App'x 804, 815 (6th Cir. 2011) (noting the Sixth Circuit has "suggested in dicta that a retaliatory cell search and seizure of an inmate's legal documents satisfies the adverse action prong of the *Thaddeus–X* test.") (quoting *Bell*, 308 F.3d at 604).

Here, even if the cell search by Buck could be considered an adverse action (and it would be a close call), Plaintiff does not allege facts connecting Buck's actions to his protected conduct of filing a complaint against Jenkins. *See Thaddeus-X*, 175 F.3d at 394 (plaintiff must allege a "causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."); *see also Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) ("[C]onclusory allegations of retaliatory motive 'unsupported by material facts

will not be sufficient to state . . . a claim under § 1983.'") (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)).

*Mendoza*

Plaintiff also brings a retaliation claim against Mendoza. *See* Doc. 27, at 13-14. Defendants do not address this claim in their motion to dismiss, *see* Doc. 49, at 12-13, and therefore neither does the Court.

Equal Protection / Due Process

Plaintiff additionally brings claims against Robinson, Brown, Buck, and May alleging violations of his equal protection and due process rights under the Fourteenth Amendment. The Court agrees with Defendants that these claims must be dismissed.

*PREA*

At the outset, Plaintiff attempts to base some of his constitutional claims on asserted violations of the PREA. *See* Doc. 27, at 6 (asserting a right, under the PREA, "to be given 30[-]day investigation check[-]ups . . . to ensure [P]laintiff was not being retaliated against[,]" which May failed to perform); *see also id.* at 19-21 (further ascribing the failure to perform PREA investigation checkups to PREA Investigator Brown, who interviewed Plaintiff about the July 2021 assault by Tate). Because the PREA provides no private right of action, a violation thereof in and of itself cannot form the basis of Plaintiff's constitutional claims.

"[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002). Section "1983 is not available to enforce a violation of a federal statute . . . 'where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983.'" *Suter v. Artist M.*, 503 U.S. 347,

355-56 (1992) (quoting *Wright v. Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 423 (1987)).

"The PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue[.]" *Montgomery v. Harper*, 2014 WL 4104163, at *2 (W.D. Ky.) (quoting *Chinnici v. Edwards*, 2008 WL 3851294, at *3 (D. Vt.)). It "does not grant prisoners any specific rights." *Id.* (quoting *Chinnici*, 2008 WL 3851294, at *3). "Courts within the Sixth Circuit have consistently held that the PREA does not create a private cause of action which can be brought by an individual plaintiff." *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521, 537 (N.D. Ohio 2020) (collecting cases) (internal quotation omitted); *accord Johnson v. Clark*, 2024 WL 970724, at *2 (N.D. Ohio); *Meinke v. Stammitti*, 2023 WL 6662990, at *6 (N.D. Ohio); *Perry v. Warden Warren Corr. Inst.*, 2020 WL 3396317, at *6 (S.D. Ohio) ("PREA does not create a private right of action" for prisoners.), *report and recommendation adopted*, 2020 WL 4013038.

*Equal Protection*

Next, to the extent Plaintiff asserts an equal protection claim based on the requirements of the PREA, or on any other basis, the Court finds Plaintiff has not pled such a claim.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws[,]" which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state an equal protection claim, Plaintiff must allege "intentional and arbitrary discrimination" by the state; that is, he must show that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). And conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. The Court finds Plaintiff's allegations of discriminatory treatment are conclusory and do not plausibly allege disparate treatment. Plaintiff asserts the following claims: (1) Robinson "violated . . . equal protection by failing to protect plaintiff from assaults and failing to place him in protective custody or failing to consider institutional transfer" (Doc. 27, at 12); (2) "Plaintiff had an equal protection right to be checked up on every 30 days as required by law" and May failed to do so (*id.* at 7); and (3) Plaintiff had a right to equal protection of that law [the PREA] to be checked on every 30 days and also have his investigation concluded" and PREA Investigator Brown failed to do so (*id.* at 21). Plaintiff does not allege anyone was treated differently than him in any regard and, as such, fails to allege any disparate treatment. *Cf., e.g.*, *Glover v. Boardman*, 2018 WL 6726875, at *7 (N.D. Ohio) ("Glover has not pled, nor adequately alleged, a Fourteenth Amendment equal protection violation because, as a threshold matter, he does not identify the inmate or allege that he was similarly situated to the unnamed prisoner whom he claims was treated more favorably than he was.").

Accordingly, Plaintiff's Fourteenth Amendment equal protection claims will be dismissed.

*Due Process*

Defendants additionally assert Plaintiff fails to state a due process claim because he has not identified an interest that was infringed. (Doc. 49, at 15-18). The Court agrees.

To state a procedural due process claim under the Fourteenth Amendment, a plaintiff must establish the deprivation of a constitutionally protected liberty or property interest. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

25

Plaintiff asserts three due process claims. First, he contends Robinson violated his due process rights "by failing to protect plaintiff from the assaults and failing to place the plaintiff into [protective custody] or even consider [protective custody] as required by PREA" and "fail[ing] to consider an institutional transfer." (Doc. 27, at 12). Second, he alleges Buck violated his due process rights by taking his phone tablet. *Id.* at 25-26. Third, he alleges May's failure to conduct a 30-day review of his PREA complaint and Investigator Brown's failure to conduct such a review or close the investigation violated his due process rights. *Id.*, at 7. Plaintiff's only response to Defendants' argument regarding his due process claims is that "failure to comply with the law" and "fail[ure] to . . . do 30 [day] wellness interviews or consider [protective custody] or a transfer" violated his due process rights. (Doc. 70, at 19).

*May, Robinson, and Brown*

As set forth *supra*, the PREA contains no private right of action, and Plaintiff's allegations that May, Robinson, and Brown did not comply with the PREA's requirements therefore do not state a protected interest for a due process claim. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989) ("[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'") (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Further, Plaintiff does not have any liberty interest in a particular placement or security classification and cannot base a due process claim on the denial of his protective custody requests. *See, e.g.*, *Pullen v. Cool*, 2016 WL 11268213, at *5 (S.D. Ohio) ("Insofar as plaintiff claims he was denied due process of law in connection with the denial of protective custody status, plaintiff has also failed to state a claim upon which relief may be granted because inmates generally have no protected liberty interest in a specific security classification.") (collecting cases).

*Buck*

Plaintiff contends Buck "deprived him of his property (phone tablet) without due process of law." (Doc. 27, at 26). He contends the tablet was later proven to be his. *Id.* Seemingly relying on the due process standard applicable to liberty interests, Plaintiff asserts this "created an atypical hardship[.]" *Id.* From the grievance documents attached to his Amended Complaint, it appears likely the tablet at issue (the "GTL tablet") was issued by the prison to him, while prison staff contended it was issued to a different inmate, and thus confiscated it. *See* Doc. 27-1, at 32, 36. Plaintiff was punished with a "30 day GTL restriction" and complained later the tablet had not been returned. *See id.* Plaintiff alleges he was denied his phone and commissary privileges after the seizure of the phone and subsequent disciplinary proceedings. (Doc. 27, at 22-23). It is unclear whether Plaintiff intends to assert a liberty interest or a property interest in the tablet. However, as set forth below, he has not plausibly pled either.

Defendants contend Plaintiff has not demonstrated a liberty interest to support a due process claim. "A prison disciplinary proceeding does not give rise to a protected liberty interest unless the restrictions imposed constitute 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life[.]'" *Rodgers v. Johnson*, 56 F. App'x 633, 636 (6th Cir. 2002) (quoting *Sandin v. Connor*, 515 U.S. 472, 484 (1995)). The Court agrees with Defendants that, to the extent Plaintiff asserts the deprivation of a liberty interest in the tablet or the restrictions imposed following the disciplinary proceeding, he has not stated a due process claim. Being denied the tablet (whether it was Plaintiff's personal property or issued to Plaintiff by the prison), is not an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *see also Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir. 1999) ("The regulation of type and quantity of individual possession in cells is typical

of the kinds of prison conditions that the Court has declared to be subject to the . . . analysis set forth in *Sandin*."); *Hinds v. Lewis*, 2019 WL 2223253, at *5 (W.D. Mich.) (recognizing that a prisoner has no right to possess unlimited property in his cell); *see also Jarrett v. Greene*, 2022 WL 13795466, at *12 (S.D. Ohio), *report and recommendation adopted*, 2022 WL 17253595 (finding no liberty interest in denial of "personal 'phone tablet' privileges"); *Wymes v. Laughton*, 2021 WL 3207121, at *3 (E.D. Mich.) ("Plaintiff does not have a liberty interest in phone privileges to which due process can attach."); *Uraz v. Ingham Cnty. Jail*, 2019 WL 4292394, at *6 (W.D. Mich.) ("[T]he 10-month limitation on phone privileges did not violate Plaintiff's right to procedural due process, because he did not have a liberty interest in unrestricted telephone use."); *Koenck v. Bolar*, 2023 WL 4461090, at *2 (N.D. Ohio) ("There is no liberty or property interest in . . . commissary privileges.").

Furthermore, assuming Plaintiff is maintaining that he was subjected to an unauthorized, intentional deprivation of his property without the procedures which were due him, he cannot state such a claim unless he pleads he has no meaningful state post-deprivation remedies available or that such remedies available are ineffective to protect his rights. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other grounds by Daniel v. Williams*, 474 U.S. 327 (1986). Plaintiff has not pleaded that state post-deprivation remedies are inadequate. *See Geer v. Ginocchio*, 2017 U.S. Dist. LEXIS 86942, *10 (S.D. Ohio) (finding plaintiff had not alleged facts showing that state post-deprivation remedies were inadequate or unavailable to him and recognizing that a "civil action for replevin is one method to seek the return of property wrongfully withheld by the state or other public entity" in Ohio) (quotation and citation omitted); *Lumbus v. Weisbar*, 2024 WL 1756915, at *18 (S.D. Ohio) (finding that, while plaintiff alleged post-deprivation remedy of a prison grievance procedure was potentially inadequate,

plaintiff's failure to address any other state remedies available to him was fatal to his procedural due process claim for the purported taking of his personal property during a search of his cell).

Plaintiff's Fourteenth Amendment due process claims will therefore be dismissed.

<u>Discovery Motion</u>

This Court previously stayed discovery pending the outcome of the currently-pending motions for judgment on the pleadings. *See* Doc. 66. Plaintiff's discovery motion is therefore denied as moot. The Court will issue an updated case management order in due course which will include discovery-related deadlines as to the remaining claims.

**CONCLUSION**

For the foregoing reasons, good cause appearing, it is

ORDERED that all claims against Defendant Paisley are DISMISSED without prejudice for lack of service; and it is

FURTHER ORDERED that Defendants May, Mendoza, Jenkins, Buck, Terence Brown, James Brown, Robinson, Hobbs, and Abbott's Motion for Partial Judgment on the Pleadings (Doc. 49) and be, and the same hereby is, GRANTED IN PART AND DENIED IN PART as set forth herein; and it is

FURTHER ORDERED that Defendants Shephard, Hupka, and interested party State of Ohio's Motion for Judgment on the Pleadings (Doc. 52), be and the same hereby is, GRANTED IN PART AND DENIED IN PART as set forth herein; and it is

FURTHER ORDERED that Plaintiff's Motion to Compel Discovery (Doc. 55), be and the same hereby is, DENIED as moot.

This case will proceed on Plaintiff's claims of deliberate indifference against Defendants May, Mendoza, Jenkins, Buck, Terence Brown, James Brown, Robinson, Hobbs, Abbott, Shepard, and Hupka and his retaliation claim against Defendant Mendoza.

        s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 27, 2024