**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**MARQUEZ B. PERRY,**

Plaintiff,

v.

**EARLENA SHEPHERD, et al.,**

Defendants.

CASE NO. 3:22 CV 688

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Currently pending in this civil rights action is a Motion for Summary Judgment filed by Defendants Earlena Shepherd, Karrie Hupka, Harold May, Kelly Mendoza, Investigator Brown, David Robinson, Major James Brown, James Hobbs, Earlena Shepherd and Penny Abbott (collectively, "Defendants"). (Doc. 87). Plaintiff Marquez B. Perry opposes. (Doc. 90). Defendants reply. (Doc. 91). Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons set forth below, Defendants' Motion is granted.

## BACKGROUND

Remaining in this 42 U.S.C. § 1983 action are two claims. Plaintiff's first claim alleges Defendants acted with deliberate indifference to his safety while he was incarcerated at Toledo Correctional Institution ("ToCI"), in violation of the Eighth Amendment. His second claim alleges a First Amendment retaliation claim against Defendant Mendoza.

While incarcerated at Warren Correctional Institution in 2019, Plaintiff was sexually assaulted by another inmate, Kevin Freeman. (Plaintiff Depo., Doc. 88, at 8-9).[1] He testified Freeman was a member of the Bloods gang and, in retaliation for Plaintiff reporting the assault, instructed other inmates to continue assaulting him. *Id.* at 9, 22. After this assault, Plaintiff was housed at Southern Ohio Correctional Facility ("SOCF") for some time. *See, generally* Doc. 27.

Plaintiff was transferred to ToCI on April 8, 2021. (Doc. 87-1, at 136). A separation order between Plaintiff and Freeman was on record. *Id.* at 293, 295. Even though both were housed at ToCI at this time, Plaintiff testified he and Freeman did not communicate or have physical contact. (Plaintiff Depo., Doc. 88, at 17).

On April 11, Plaintiff submitted a kite to the Warden's office stating Freeman previously sexually assaulted him, was a high-ranking Bloods member, and arranged for inmates at his prior institution to assault and extort him. (Doc. 87-1, at 295).[2] He further stated placement in general population at ToCI would endanger his safety. *Id.* On April 13, the Warden's administrative assistant (who is not a Defendant here) responded Plaintiff's request for Protective Control had been denied because a separation order was on record and directed him to follow up with Defendant Robinson. *Id.*

On April 14, Plaintiff submitted a kite to Robinson stating Freeman was his rapist, a separation order existed between them, and Freeman had previously tried to have other inmates assault him. *Id.* at 293. Plaintiff asked whether Freeman remained at ToCI. *Id.* On April 21,

1. For the deposition of Plaintiff, the Court cites the internal deposition pagination rather than the ECF-generated page numbers.
2. The prison records redact Freeman's name. The parties agree the inmate referenced in those records is Kevin Freeman. *See* Doc. 87, at 8-12, 15, 18-21; Doc. 90, at 9-10, 14. The Court therefore refers to him as Freeman.

Robinson responded he checked Plaintiff's separation orders, confirmed a separation order was in place for Freeman, and would "see that this issue is handled." *Id.*

On July 6, 2021, Plaintiff was assaulted in the shower by Deandre Tate, whom he identified as a Bloods member. *Id.* at 328; (Plaintiff Depo., Doc. 88, at 23-24, 38).[3] The incident report states Plaintiff was thrown naked from the shower and later found in his cell with apparent injuries, prompting a medical emergency. (Doc. 87-1, at 328).[4] Tate was placed in the Transitional Placement Unit ("TPU"). (Plaintiff Depo., Doc. 88, at 38).[5]

Plaintiff claims he told Mendoza about Freeman, the prior assaults, and his belief Freeman was influencing other inmates to assault him. *Id.* at 25-26. He also testified he reported threats to Mendoza in July or August 2021, and she advised him to seek Protective Control. *Id.* at 47-49. Also in July 2021, Plaintiff states he filed grievances and a civil complaint against several prison officials, including Mendoza. (Doc. 27-1, at 9). He further alleges Mendoza stated in the C-Side hallway, "yeah I love inmate Tate [b]ecause he fucks people up," which Plaintiff states embarrassed him and hurt his feelings. (Doc. 27, at 13-14).

On August 1, another inmate ("Starr") assaulted Plaintiff after a meal. (Doc. 87-1, at 311-13).[6] An officer used OC spray to stop the assault, and Starr was placed in restricted housing. *See*

---

3. Again, the prison records identifying Tate by name are redacted. The parties agree the redacted references are to Tate. *See* Doc. 87, at 10-12, 21; Doc. 90, at 4, 10.

4. The Parties dispute the severity of the assault and what the surveillance footage depicts. (Doc. 87 at 10; Doc. 90, at 4; Doc. 91 at 3-4). Plaintiff also cites Exhibits A and B attached to his opposition, which contain still images from the surveillance footage. (Doc. 90, at 19). The footage shows Plaintiff being thrown naked from the shower. (July 6, 2021 Video Surveillance at 8:38:56). Even taking Plaintiff's description of the incident and the video as true, it does not change the outcome herein.

5. Plaintiff testified the TPU generally limited inmates' physical contact with other inmates, except for their cellmates, although inmates could communicate with one another. (Plaintiff Depo., Doc. 88, at 38-39).

6. Once again, the records identifying this inmate by name are redacted, but Defendants identify him by the name "Starr" and Plaintiff also identifies him as "Star" in his deposition. (Doc. 87, at 11; Plaintiff Depo., Doc. 88, at 44).

*id.* Plaintiff testified he believed Starr was paid by Bloods gang members to assault him. (Plaintiff Depo., Doc. 88, at 43-44).[7]

On August 2, Defendant Investigator Brown reviewed a written request in which Plaintiff asked for Protective Control. (Doc. 87-1, at 70).[8] Brown documented before the August 1 assault, he and another correctional officer interviewed Plaintiff regarding the July 6 assault, during which Plaintiff reported issues with "the Blood gang" and stated a Bloods member was continually having him assaulted. *Id.* The following day, Plaintiff completed a formal Request for Protective Control, stating he believed his safety was in jeopardy if he remained in general population. *Id.* at 69.

On August 5, Plaintiff signed a form stating he no longer wanted to be in Protective Control and believed his safety was no longer in jeopardy. *Id.* at 68; (Plaintiff Depo., Doc. 88, at 81). The form also indicated he believed he could live safely in general population while requesting separation from Tate. *Id.* Plaintiff claims he signed the form to get out of "the hole." *See* Plaintiff Depo., Doc. 88, at 81 ("[B]asically I filed for protective control, and they just had me sitting in the hole, and I got tired of sitting in the hole, so I believe I tried to sign out of the hole by signing

---

7. The Parties again dispute the extent of Plaintiff's injuries following the assault. (Doc. 87, at 11; Doc. 90, at 5). Plaintiff cites Exhibits C and D attached to his opposition, which contain still images from the surveillance footage. (Doc. 90, at 20). The surveillance footage at 12:11:10 does not clearly depict whether Plaintiff had a black eye. (August 1, 2021 Video Surveillance at 12:11:10). Even taking Plaintiff's description of the incident and the video as true, it does not change the outcome herein.

8. Plaintiff identifies Investigator Brown and Major James Brown as separate Defendants. *See* Doc. 27; Doc. 27-1, at 16, 20; Doc. 90 at 7. Defendants' briefing identifies Terence Brown as "Lt. Brown" and confirms he is the Defendant Plaintiff identifies as Investigator Brown. (Doc. 87, at 11; Doc. 91, at 13). The Court therefore refers to Terence Brown as "Investigator Brown" and James Brown as "Major Brown."

this."). Officials, however, disregarded this request. *See id.* at 81-82 ("[T]hey disregarded this and said that I had to stay under [Protective Control] investigation.").[9]

On August 9, Plaintiff completed an Inmate Confidential Statement in connection with the Protective Control investigation, describing the prior sexual assault, gang-related harassment, and subsequent assaults. (Doc. 87-1, at 66-67). The Protective Control Screening included a signature which appears to be Mendoza's. *Id.* at 58.

On August 19, the Protective Control investigative summary recorded Plaintiff's claims the Bloods were targeting him and another inmate had "issued [out] the hit on him." *Id.* at 60-62. The summary also noted Plaintiff reported these concerns to Defendants May and Robinson in April 2021 "when he first arrived at TOCI." *Id.* at 60. The investigation confirmed the prior sexual assault Plaintiff reported in 2019 and the July 6 and August 1, 2021, assaults at ToCI, but noted the inmate Plaintiff accused of directing the attacks had been released on August 11 and only one of the three identified assailants was affiliated with the Bloods. *Id.* at 60-62. The committee also considered Plaintiff's August 5 statement he could safely live in general population. *Id.* at 60, 68.

On August 24, May adopted the committee's recommendation and denied Protective Control. *Id.* at 57. A Local Separation Order was issued between Plaintiff and Tate. *See id.* at 7, 61, 63.[10] On August 26, Plaintiff filed an objection to the denial, stating Bloods members had

9. Plaintiff characterizes the circumstances surrounding his signature as duress. (Doc. 90, at 7). His testimony, however, simply states he "got tired of sitting in the hole" and provides no further support for the alleged "duress." (Plaintiff Depo., Doc. 88, at 81-82).

10. A local separation prohibits the inmates from being assigned to the same work, education, or living area. (Doc. 87-1, at 35). ODRC Policy provides where an institutional separation is not feasible, inmates may be locally separated, with measures taken to ensure they are not in close proximity during work, recreational, or leisure activities. (Doc. 87-1, at 361) (*Ohio Dep't of Rehab. & Corr., Incarcerated Individual Separations*, Policy No. 53-CLS-05).

continued to extort and assault him, and he remained at risk if returned to general population. *Id.* at 56.

On August 28, Plaintiff submitted a kite stating inmates in TPU were constantly harassing him because he had reported being raped and alleging a correctional officer disclosed the prior rape to another inmate; he stated this was impacting his mental health, and he needed to speak to someone. *Id.* at 265. On August 31, Investigator Brown submitted a mental-health referral for Plaintiff and asked him to identify the officer. *Id.* Another correctional officer closed the matter on September 16 after Plaintiff failed to respond. *Id.*

On September 2, Defendant Shepherd, on behalf of Bureau of Classification and Reception ("BOCR"), affirmed the denial of Protective Control. *Id.* at 53. She concluded the record did not establish a "statewide, persistent, verifiable threat," noted a local separation had been imposed, and stated the committee's recommendation and the Warden's decision were "reasonably based on the facts established in the investigation." *Id.*

On September 7, Plaintiff submitted an informal complaint reporting he was assaulted after returning to general population and threatened with death if he reported the incident. *Id.* at 264. A non-Defendant correctional officer responded: "Who said you were to stay in TPU, [w]hen did you get into a fight, who is the person that is after you, are you requested PC because I will forward this on to get one completed." *Id.* Two days later, Plaintiff told a different non-Defendant correctional officer he wanted to see mental health because another inmate threatened to kill him; Plaintiff was placed in TPU in response. *Id.* at 352.

On September 28, another inmate assaulted Plaintiff, and the assault report identified the assailant's affiliation as "Konvicted Family." *Id.* at 300. Plaintiff later told medical staff he was "fine" and wanted to leave, so he was released to his block with pain medication. *Id.* at 406-07.

On October 9, 2021, Plaintiff was assaulted by another inmate, Merriweather. (Plaintiff Depo., Doc. 88, at 53-55). Plaintiff testified Merriweather assaulted him in another inmate's cell while a second inmate prevented him from leaving. *Id.*[11] Plaintiff later attributed this assault to the same ongoing Bloods-related retaliation he believed Freeman was directing. (Doc. 87-1, at 37-38).

Defendants contend Plaintiff was not assaulted again after October 9, 2021. (Doc. 87, at 15). However, Plaintiff testified he was assaulted two more times: first in December 2021 or January 2022 by an inmate he claims was paid by a Bloods member, and second approximately ten days later by another inmate. (Plaintiff Depo., Doc. 88, at 57-60). He did not report the second assault to staff. *Id.* at 60. Plaintiff testified before those assaults, he reported the threat to the Warden, Defendant Terence Brown, Defendant Hobbs, Defendant Abbott, Defendant Mendoza, Defendant Major James Brown, and his mental-health provider. *Id.* at 58-59.

On October 12, Investigator Brown emailed Defendant Abbott requesting another Protective Control investigation stating Plaintiff had "ongoing issues with the 'Bloods'" and his concern "seem[s] to be legit." (Doc. 87-1, at 47). The investigation was assigned to non-Defendant Gajewski. *See id.* at 48.

On October 19, Plaintiff submitted a second formal request for Protective Control. *Id.* at 36. In a two-page confidential statement, Plaintiff described the prior sexual assault, Bloods-related extortion and harassment, and multiple subsequent assaults, providing dates, locations, participants, and alleged extortion amounts. *Id.* at 37-38.

11. The parties dispute whether Plaintiff entered the cell intending to fight Merriweather or entered without knowing Merriweather intended to assault him. They also disagree about what the surveillance footage shows. (Doc. 87, at 14; Doc. 90, at 5-6; Doc. 91, at 6). The footage does not clearly resolve those disputes. *See* October 9, 2021 Video Surveillance at 2:57:46-3:00:13. Even taking Plaintiff's description of the incident as true, it does not change the outcome herein.

On November 4, a Protective Control committee consisting of Defendants Abbott and Mendoza and Gajewski reviewed Plaintiff's allegations. *Id.* at 30-34. The committee noted Plaintiff claimed he was on a Bloods "hit-list," but found insufficient information to verify a qualifying threat before recommending separation orders and his return to general population. *See id.*

On November 22, Defendant May approved the recommendation to return Plaintiff to general population and denied Protective Control for "insufficient evidence." *Id.* at 29, 31. May also approved an Institution Separation Order from two inmates whose names are redacted. *Id.* at 35. Plaintiff appealed, stating he had suffered five assaults since arriving at ToCI, including three since the prior Protective Control proceeding, and believed he would be assaulted again if returned to general population. *Id.* at 28.

On December 1, Defendant Hupka, on behalf of BOCR, denied Plaintiff's appeal, finding insufficient evidence of a statewide, persistent, verifiable threat and noting Freeman had been released. *Id.* at 25.

In December, Plaintiff questioned his placement in TPU and requested return to his prior housing assignment. *See* Doc. 87-1, at 228. On December 22, Defendant Abbott informed Plaintiff he remained under a Protective Control investigation and would be released from TPU when it concluded. *Id*.

On January 31, 2022, Defendant Major Brown received a written request from Plaintiff stating his safety was in danger in general population and forwarded it for another Protective Control investigation. *Id.* at 16. Gajewski interviewed Plaintiff. *Id.* at 11-12. Gajewski reported Plaintiff said he had been subject to "[s]everal assaults by the Bloods and some others," and he was "being assaulted by Blood[s] whenever sent to [general population]." *Id.* at 11. Plaintiff further told Gajewski he had reported these incidents "to several staff members over . . . several months."

*Id.* In a confidential statement the same day, Plaintiff stated the Bloods had "a hit on [his] head." *Id.* at 13.

On February 6, Plaintiff filed a kite requesting consideration for a porter job. *Id.* at 210. On February 7, Defendant Abbott rejected the request, noting Plaintiff had "just stated [he was] in fear for [his] life" and the Protective Control investigation remained ongoing. *Id.*

On February 7, the third Protective Control investigation summary report shows Plaintiff's claims of Blood-related problems, prior assaults, and he was on a "hit list" but the report states no new witnesses, locations, times, or dates were provided and the security-threat-group coordinator was unaware of any new threats**.** *Id.* at 7-8. Gajewski concluded there was insufficient information to verify a qualifying threat and recommended against Protective Control. *Id.* at 8. Defendant May denied Protective Control for "insufficient evidence." *Id.* at 3. Plaintiff appealed this decision claiming gang members remained after him and would continue to try and harm him. *Id.* at 21. Defendant Hupka, on behalf of BOCR, denied the appeal citing "no new information provided nor incidents that occurred since the last P[rotective] C[ontrol] investigation." *Id.* at 6.

In February and March 2022, Plaintiff requested placement in general population and sought kitchen work; Defendant Abbott responded to a housing request stating Plaintiff had not yet reached the halfway point of his sanction. *Id.* at 192.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains

sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). This burden may be discharged by "pointing out to the District Court" an absence of evidence supporting the nonmoving party's case. *Id.* at 325. Once the moving party satisfies this burden, the nonmoving party may not rest on the pleadings but must identify evidence sufficient to create a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "While allegations may suffice to withstand a motion to dismiss, they do nothing to withstand summary judgment." *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1163 (6th Cir. 2021) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009)).

Where the nonmoving party bears the ultimate burden of proof, the question is whether he has presented a jury question as to each challenged element of his claim. *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002). More than a scintilla of evidence is required; there must be "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The nonmoving party must also direct the Court to the specific portions of the record upon which he relies. *See* Fed. R. Civ. P. 56(c)(1), (3). The Court "need consider only the cited materials," Fed. R. Civ. P. 56(c)(3), and is not required to search the record for evidence supporting a party's position. *See Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("'[J]udges are not like pigs, hunting for truffles' that might be buried in the record." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

## Discussion

Defendants contend they are entitled to summary judgment on Plaintiff's remaining claim because there is no genuine dispute of material fact as to either the objective or subjective prong

of his Eighth Amendment deliberate indifference claim. (Doc. 87, at 6-7). They further contend there is no evidence to support Plaintiff's First Amendment retaliation claim against Mendoza. (*Id.* at 7).

For the reasons set forth below, the Court agrees and grants summary judgment in favor of all Defendants on all remaining claims.[12]

<u>Eighth Amendment Failure to Protect Claim</u>

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Prison officials therefore must take reasonable measures to guarantee inmate safety, including protecting prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). But not every injury suffered by one prisoner at the hands of another results in constitutional liability. *Id. at* 834. An Eighth Amendment failure-to-protect claim contains both objective and subjective components. *Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021). For the objective component, Plaintiff must show he was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 834). For the subjective component, Plaintiff must show the particular official subjectively perceived facts from which to infer a substantial risk of serious harm, actually drew that inference, and consciously disregarded the risk. *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014). Deliberate indifference requires more than mere negligence and is equivalent to subjective recklessness.

12. The Court previously granted in part and denied in part Motions for Judgment on the Pleadings filed by these and other Defendants. *See* Doc. 73. This ruling included dismissal of the retaliation claims brought against Defendants Inspector Jenkins and Correctional Officer Buck as well as equal protection and due process claims against, *inter alia*, Buck. *See id.*at 21-29. These were the only claims asserted against Jenkins or Buck. *See id.* at 10 (summarizing claims). The Court, however, mistakenly included Buck and Jenkins in its conclusion sentence regarding the deliberate indifference claims and thus neither was terminated from this Court's docket at the time or ruling. *Id.* at 30. As is clear from the substance of the opinion itself, no such claims were brought against either and all claims against Buck and Jenkins were dismissed in the September 27, 2024, Memorandum Opinion and Order. *Id.*

*Farmer*, 511 U.S. at 835-39. An official therefore is not liable merely because he should have perceived a risk but did not. *Id.* at 838.

Defendants argue Plaintiff cannot satisfy the objective component because none of his assailants previously threatened or harmed him, his warnings were vague, and his own conduct undermined his claimed fears. (Doc. 87, at 17-18). They point to his requests for general-population placement and kitchen work, drug purchases from Bloods members, Freeman's August 2021 release, and the absence of any documented assault after October 9, 2021. *Id.* Relying on *Reedy v. West*, 988 F.3d 907, 913 (6th Cir. 2021), Defendants contend Plaintiff failed to identify a sufficient specific threat.

Plaintiff responds the objective inquiry does not require a threat from the inmate who ultimately commits the assault. (Doc. 90, at 8) (citing *Farmer*, 511 U.S. at 843). He distinguishes *Reedy* based on his repeated assaults, extortion, and gang-related threats and also disputes whether Freeman's release eliminated the risk. *Id.* 8-10. Plaintiff further relies on *Hamilton v. Eleby*, 341 F. App'x 168, 171 (6th Cir. 2009), where the Sixth Circuit found the objective component satisfied based on gang threats, a "hit" on the Plaintiff and prior assaults. *Id.* at 10.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds a genuine dispute of material fact on the objective component. Plaintiff repeatedly reported he was being extorted and targeted by Bloods members and believed a "hit" had been placed on him. (Doc. 87-1, at 37-38, 60-62, 11-13). Although the record does not independently corroborate Plaintiff's claim the Bloods or Freeman directed each assault, it does document multiple assaults during his incarceration at ToCI. *Id.* at 60-62, 300, 311-13, 328. These facts differ from *Reedy*, where the plaintiff relied on generalized threats arising from a cellmate dispute and there was no history of prior violence between the inmates. *Reedy*, 988 F.3d at 913. It is closer to *Richardson v. Bauman*, where the Sixth Circuit found a genuine dispute on the objective component even though there

was "no proof, other than hearsay," the gang allegedly threatening the plaintiff was present at the institutions. 702 F. App'x 402, 406 (6th Cir. 2017). Considering Plaintiff's reports together with the documented assaults, a reasonable jury could find he faced an objective substantial risk of serious harm.

The Court next turns to the subjective component. Because each Defendant's liability turns on what that Defendant knew and did, the Court considers them separately. *Estate of Zakora v. Chrisman*, 44 F.4th 452, 472 (6th Cir. 2022). The Court may not (and does not) impute one Defendant's knowledge to another. *Reilly v. Vadlamudi*, 680 F.3d 617, 626-27 (6th Cir. 2012).

*Warden Harold May*

Defendants argue May lacked subjective knowledge because Plaintiff's warnings were vague and did not identify a specific threat. (Doc. 87, at 19-20). They further contend May reasonably responded to Plaintiff's concerns by ordering Protective Control investigations and issuing separation orders. *Id*. Defendants also argue Plaintiff improperly relies on what prison officials collectively knew rather than what each Defendant individually knew. (Doc. 91, at 10-11).

Plaintiff does not identify what May personally knew, explain how May disregarded a risk he appreciated, or cite evidence bearing on either Instead, Plaintiff argues generally: "Due to Plaintiff's numerous communications with Defendants regarding the issue, they were aware of the substantial risk of serious harm that he faced." (Doc. 90, at 11). He also argues his reports were not vague, and the separation measures did not adequately address the alleged risks. *Id.* at 7, 12-13. However, to survive summary judgment, Plaintiff must identify evidence from which a reasonable jury could find May *himself* knew of and disregarded a substantial risk to Plaintiff's safety. *See Farmer*, 511 U.S. at837 (1994); *Reilly*, 680 F.3d at 626-27. Plaintiff has not identified

such evidence in his briefing. *See Celotex*, 477 U.S. at 324 (requiring the nonmoving party to "designate specific facts showing that there is a genuine issue for trial").

Considering other evidence before the Court does not change the outcome. May acted on the recommendations from three Protective Control investigations. (Doc. 87-1, at 3, 29, 31, 57). In August 2021, the investigation confirmed the prior sexual assault and the July 6 and August 1 assaults but noted the inmate Plaintiff accused of directing the attacks had been released, only one of the three identified attackers was affiliated with the Bloods, and Plaintiff had previously stated he could safely live in general population. *Id.* at 60-62, 68. The committee recommended denying Protective Control, and May adopted the recommendation. *Id.* at 57. In November, the committee considered Plaintiff's claim he was on a Bloods "hit-list," but found insufficient information to verify a qualifying threat and recommended separation orders and return to general population. *Id.* at 30-34. May approved the recommendation, denied Protective Control for "insufficient evidence," and approved an Institution Separation Order from two inmates. *Id.* at 29, 31, 35. In February 2022, the investigation again found insufficient information to verify a qualifying threat, noting Plaintiff provided no new witnesses, locations, times, or dates and the security-threat-group coordinator was unaware of any new threats. *Id.* at 7-8. May again denied Protective Control for "insufficient evidence." *Id.* at 3.

These facts do not support a finding May consciously disregarded a substantial risk of serious harm. Investigations were carried out and May adopted the recommendations. (Doc. 87-1, at 7-8, 29-35, 57, 60-62). Although Plaintiff disagrees with those decisions, he identifies no evidence May knew the investigative findings were unreliable or disregarded a risk he actually appreciated. *See Richardson*, 702 F. App'x at 406-08 (affirming summary judgment where officials investigated alleged gang threats but lacked sufficient information to substantiate them); *Conley v. Warden*, 2008 WL 4657084, at *5 (S.D. Ohio) (finding no deliberate indifference where

prison officials considered the inmate's complaints, investigated them, and denied protective control). Furthermore, courts generally will not "freely substitute [their] judgment for that of officials who have made a considered choice." *Conley*, 2008 WL 4657084, at *5 (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)).

Viewing the record in the light most favorable to Plaintiff, May's decision to follow those recommendations would not permit a reasonable jury to find he consciously disregarded a substantial risk to Plaintiff's safety. May is entitled to summary judgment.

*UMC Robinson*

Defendants next argue Robinson also lacked subjective knowledge because Plaintiff's warnings were vague and did not identify a specific imminent threat. (Doc. 87, at 19). They further contend Robinson reasonably responded to Plaintiff's concerns by confirming the existing separation between Plaintiff and Freeman. *Id.* As with May, Defendants also contend Plaintiff improperly relies on Defendants' collective knowledge. (Doc. 91, at 10-11).

Plaintiff does not separately address Robinson or identify evidence showing what Robinson personally knew or how he disregarded a risk to Plaintiff's safety. Instead, he argues generally his numerous communications with "Defendants" made them aware of the substantial risk he faced. (Doc. 90, at 11). This generalized argument does not identify any Robinson-specific basis for liability. *See Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020) (explaining a § 1983 plaintiff opposing summary judgment "must produce evidence supporting each individual defendant's personal involvement in the alleged violation" (quoting *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018))). Plaintiff has failed to preserve a Robinson-specific deliberate-indifference argument.

When considering the record evidence, the outcome does not change. On April 14, Plaintiff submitted a kite stating another inmate had sexually assaulted him, a separation order existed

between them, and the inmate had previously tried to have other inmates assault him. (Doc. 87-1, at 293). Plaintiff testified he spoke with Robinson the following month and told him about the prior assaults and extortion at SOCF, Freeman's gang influence, and his fear of further assaults. (Plaintiff Depo., Doc. 88, at 13-14). Plaintiff acknowledged Robinson told him he would be okay because procedures were in place and explained he and Freeman could be kept separate. *Id.* at 14-15. Therefore, accepting Plaintiff's account, Robinson responded to the risk Plaintiff described by relying on the separation procedures already in place. (Doc. 87-1, at 293; Plaintiff Depo., Doc. 88, at 14-15). There is no evidence Robinson later learned those measures were ineffective or knew of and consciously disregarded a continuing substantial risk to Plaintiff's safety. *See Farmer*, 511 U.S. at 837, 844 (requiring actual awareness of the risk and explaining an official who responds reasonably to a known risk is not deliberately indifferent).

For these reasons, summary judgment is granted in Robinson's favor.

*DWO Hobbs*

Defendants argue Plaintiff cannot establish deliberate indifference as to Hobbs because his alleged involvement arose in 2022 and, according to Defendants, Plaintiff was not assaulted or extorted after October 2021. (Doc. 87, at 20). They also dispute Plaintiff's testimony concerning the alleged later assaults, pointing to his housing history and the absence of contemporaneous kites or grievances reporting them. (Doc. 91, at 6-7). Defendants again argue Plaintiff improperly relies on what prison officials collectively knew rather than what Hobbs personally knew. *Id.* at 10-11.

Plaintiff responds he was assaulted twice after October 9, 2021, and contends he reported the first alleged assault to Hobbs and several other Defendants. (Doc. 90, at 6-7). The deposition testimony Plaintiff cites, however, states he reported the information before the alleged assault. (Plaintiff Depo., Doc. 88, at 58). When asked whether he reported it before or after the assault, Plaintiff responded, "Before. Definitely before." *Id.* Plaintiff then identified Hobbs among several

officials to whom he reported the information. *Id.* at 58-59. But Plaintiff did not testify when he contacted Hobbs specifically, what he told Hobbs, or how Hobbs responded. *Id.* at 58-59.

The Court need not resolve whether the later assaults occurred because, even accepting Plaintiff's testimony, he fails to show Hobbs acted with deliberate indifference. Notably, Plaintiff himself encountered a similar problem in another failure-to-protect case. *See Perry v. Warden Warren Corr. Inst.*, 2022 WL 3369662, at *8 (S.D. Ohio) (finding no genuine dispute where Plaintiff failed to identify when the relevant conversations occurred or what specific information he provided each defendant), *report and recommendation adopted*, 2022 WL 4493913.

Without evidence showing what Hobbs personally knew or how he responded, no reasonable jury could find he consciously disregarded a substantial risk to Plaintiff's safety.

*Kelly Mendoza*

Defendants argue Plaintiff cannot establish deliberate indifference as to Mendoza because her relevant involvement occurred after October 2021, when Plaintiff was no longer being assaulted or extorted. (Doc. 87, at 20). They also fault Plaintiff for relying only on collective, not individual knowledge. (Doc. 91, at 10-11). Defendants further contend prison officials reasonably responded to Plaintiff's concerns through Protective Control investigations, TPU placement, and separation measures. *Id.* at 11.

Plaintiff does not address Mendoza's subjective knowledge or response in his discussion of the subjective component. Instead, he argues generally his numerous communications with "Defendants" made them aware of the substantial risk he faced and maintains his warnings were detailed and the separation measures were inadequate to address the alleged gang-wide threat. (Doc. 90, at 7, 11-13). But Plaintiff must identify evidence from which a reasonable jury could find Mendoza herself knew of and consciously disregarded a substantial risk to his safety. *See Farmer*, 511 U.S. at837; *Reilly*, 680 F.3d at 626-27. Once Defendants identified the absence of

evidence sufficient to establish the subjective component as to Mendoza, Plaintiff was required to identify specific facts showing a genuine dispute for trial. *See Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405-06 (6th Cir. 1992) (explaining once the moving party satisfies its initial burden, the nonmoving party must designate specific facts showing a genuine issue for trial).[13]

Even considering the record evidence, the outcome does not change. In August and November 2021, Mendoza participated in Plaintiff's Protective Control screenings, as reflected by her signatures on the screening forms. (Doc. 87-1, at 30, 58). Both investigations recommended against Protective Control and included separation measures, with the November committee expressly finding insufficient information to verify a significant threat. *Id.* at 29, 30-34, 57, 60-63. By Plaintiff's own account, Mendoza specifically directed him to seek Protective Control. (Plaintiff Depo., Doc. 88, at 47-49). On this record, the evidence does not show Mendoza ignored Plaintiff's concerns or consciously disregarded a risk she appreciated. *See Richardson* 702 F. App'x at 406-08. Plaintiff's disagreement with the committees' response does not establish deliberate indifference. *See Conley*, 2008 WL 4657084, at *5.

*Karrie Hupka*

Defendants argue Hupka lacked subjective knowledge because she relied on the Protective Control findings, Plaintiff provided no new credible information on appeal, and Freeman had already been released. (Doc. 87, at 20). They also contend there is no evidence Plaintiff was extorted or assaulted at ToCI on or after December 1, 2021, the date of Hupka's decision. *Id.* Plaintiff responds only to the latter argument, pointing to his testimony he was assaulted after October 2021, including in 2022. (Doc. 90, at 9). Once again, he does not identify specific evidence

---

13. Plaintiff cites Mendoza's deposition testimony in support of this argument. (Doc. 90, at 15). No transcript of Mendoza's was filed with the Court, and the docket reflects only Plaintiff's notice to take her deposition. *See* Doc. 80. The cited testimony is not part of the summary-judgment record, and the Court does not consider it. *See* Fed. R. Civ. P. 56(c)(1)(A), (c)(3).

showing what Hupka knew when she decided his appeal or how she consciously disregarded a substantial risk to Plaintiff's safety.

The record likewise does not create a genuine dispute as to Hupka. Acting on behalf of the BOCR, Hupka reviewed Plaintiff's appeals from two Protective Control denials. (Doc. 87-1, at 6, 25). In December 2021, she denied the first appeal because the record did not establish a statewide, persistent, verifiable threat and Freeman had been released. *Id.* at 25. In February 2022, she denied the second appeal because there was "no new information provided nor incidents that occurred since the last PC investigation." *Id.* at 6. She considered Plaintiff's allegations through the investigative findings before her, which did not substantiate the broader gang-related threat he alleged. *See Richardson*, 702 F. App'x at 406-08.

Plaintiff has not identified evidence sufficient to permit a reasonable jury to find Hupka consciously disregarded a substantial risk to his safety. Therefore, the Court grants summary judgment to Hupka.

*Investigator Brown*

Defendants argue Plaintiff cannot establish deliberate indifference as to Investigator Brown because, when Brown became aware of Plaintiff's safety concerns, he responded by referring them for further investigation. (Doc. 87, at 20). Plaintiff does not separately address Brown under the subjective prong and instead relies on his general argument his numerous communications with "Defendants" made them aware of the substantial risk he faced. (Doc. 90, at 11). Plaintiff must identify specific facts creating a genuine dispute as to Brown's own knowledge and conduct. *See Guarino.*, 980 F.2d at 405-06. Plaintiff fails to meet his burden as to Investigator Brown.

Considering evidence otherwise before the Court does not change the outcome. Plaintiff testified he reported the threat underlying the January assault to Investigator Brown and several other officials before the assault occurred. (Plaintiff Depo., Doc. 88, at 58-59). However, he did

not identify what information he specifically provided Brown or what Brown said or did in response. *Id.* On August 2, 2021, Brown documented Plaintiff's report of problems with the Bloods and his request for Protective Control; Plaintiff requested Protective Control the following day. (Doc. 87-1, at 69-70). Later that month, after Plaintiff complained of harassment and alleged a correctional officer had disclosed his prior sexual assault to other inmates, Brown submitted a mental-health referral and asked Plaintiff to identify the officer involved. *Id.* at 265. Following the October 9 assault, Brown requested another Protective Control investigation because Plaintiff had "ongoing issues with the 'Bloods'" and his concerns "seem[s] to be legit." *Id.* at 47. The record shows when Brown received a complaint from Plaintiff he responded, and when necessary, escalated the concern. Plaintiff therefore has not created a genuine dispute as to the claim against Investigator Brown.

*Major Brown*

Defendants argue Major Brown lacked subjective knowledge because, when Plaintiff informed him his safety was at risk, Brown referred the matter for another Protective Control investigation. (Doc. 87, at 20). Plaintiff again contends Defendants are incorrect that he was not assaulted after October 2021. (Doc. 90, at 9). Plaintiff does not otherwise address Major Brown individually or identify evidence showing he disregarded a substantial risk to Plaintiff's safety. Plaintiff fails to identify evidence from which a reasonable jury could find Major Brown consciously disregarded such a risk. *See Guarino*, 980 F.2d at 405-06.

Nor does the record create a genuine dispute. Plaintiff testified he reported the threat underlying the January assault to Major Brown and several other officials before the assault occurred. (Plaintiff Depo., Doc. 88, at 58-59). The testimony does not identify what Major Brown said or did in response, and merely grouping Major Brown with several other officials to whom Plaintiff reported the threat does not show Major Brown consciously disregarded it. *Id.* The record

shows when Major Brown received Plaintiff's January 31, 2022 written request stating his safety was in danger in general population, he forwarded the matter for another Protective Control investigation. (Doc. 87-1, at 16). Referring a reported safety concern for further investigation is a reasonable response to a known risk. *See Mangum v. Repp*, 674 F. App'x 531, 537-38 (6th Cir. 2017) (finding no deliberate indifference where the official documented reported threats, referred them to prison officials, and recommended a transfer).

On this record, no reasonable jury could find Major Brown consciously disregarded a substantial risk to Plaintiff's safety.

*Earlena Shepherd*

Defendants argue Plaintiff cannot establish deliberate indifference as to Shepherd because she relied on the Protective Control committee's findings, Plaintiff provided no new evidence establishing a substantial risk, Freeman had been released, and a local separation had been imposed. (Doc. 87, at 21). Plaintiff does not address Shepherd anywhere in his opposition. *See generally* Doc. 90. A plaintiff abandons a claim by failing to address it in response to a motion for summary judgment. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). Plaintiff fails to meet his burden.

Even considering evidence Plaintiff does not cite, there is no genuine dispute of material fact. Shepherd, on behalf of the BOCR, reviewed the records from the Protective Control proceedings and denied Plaintiff's appeal, concluding there was insufficient evidence of a "statewide, persistent, verifiable threat" and noting a local separation had been imposed. (Doc. 87-1, at 53).

Based on the single encounter identified with Shepherd, a reasonable jury therefore could not find Shepherd consciously disregarded a substantial risk to Plaintiff's safety.

*Penny Abbott*

Defendants argue Plaintiff cannot establish deliberate indifference as to Abbott because her alleged involvement arose in 2022 and Plaintiff was not assaulted or extorted after October 2021. (Doc. 87, at 20). And they again point out Plaintiff's improper reliance on collective, rather than individual knowledge. (Doc. 91, at 6-7, 10-11). Plaintiff responds he was assaulted after October 2021 and disputes Defendants' characterization of his warnings as vague, pointing specifically to the detailed Protective Control request reviewed by the committee consisting of Abbott and Mendoza. (Doc. 90, at 7, 12). Plaintiff does not identify evidence showing Abbott consciously disregarded the risk he describes. Once Defendants identified the absence of evidence sufficient to establish the subjective component as to Abbott, Plaintiff was required to designate specific facts showing a genuine dispute for trial. *See Guarino* , 980 F.2d at 405-06. Plaintiff has not done so.

The record shows Abbott was involved before 2022. On October 12, 2021, Investigator Brown asked her to initiate another Protective Control investigation, stating Plaintiff had "ongoing issues with the 'Bloods'" and his concerns "seem[s] to be legit." (Doc. 87-1, at 47). Abbott later served on the November Protective Control committee, which reviewed Plaintiff's allegations and recommended separation measures and return to general population. *Id.* at 30-34. Plaintiff also testified he reported the threat prior to the first alleged assaults in 2022 to Abbott and several other officials but did not identify what he specifically said or how she responded. (Plaintiff Depo., Doc. 88, at 58-59). In December and February, Abbott continued to treat Plaintiff as subject to the Protective Control process, informing him he would remain in TPU until the investigation concluded and later denying his porter job request because he had "just stated [he was] in fear for [his] life." (Doc. 87-1, at 210, 228). Later, Plaintiff also requested placement in general population and kitchen work to Abbott. *See id.* at 191-203.

Although the record shows Abbott was aware of Plaintiff's complaints, it does not establish she actually appreciated a substantial risk to his safety and disregarded it. The Protective Control investigation in which she participated was a reasonable response to Plaintiff's reported concerns and found insufficient information to verify a qualifying threat. (Doc. 87-1, at 30-34). Plaintiff also repeatedly sought placement in general population and requested jobs which would place him around other inmates; this would not have alerted Abbott to a substantial risk of harm and instead cut against an inference she actually appreciated such a risk. *See id.* at 191-203, 210. Abbott continued to account for Plaintiff's stated safety concerns, including by denying his porter request because he had recently stated he feared for his life. *Id.* at 210.

Viewing the record in Plaintiff's favor, no reasonable jury could find Abbott knew of and consciously disregarded a substantial risk to Plaintiff's safety; therefore, summary judgment is granted to Abbott.

<u>First Amendment Retaliation</u>

A First Amendment retaliation claim requires a plaintiff to show: (1) he engaged in protected conduct; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). Although the adverse-action threshold is not demanding, inconsequential actions are insufficient. *Bell v. Johnson*, 308 F.3d 594, 600, 603-04 (6th Cir. 2002). Verbal harassment and minor threats generally do not constitute adverse action sufficient to support a retaliation claim. *See Smith v. Craven*, 61 F. App'x 159, 162 (6th Cir. 2003).

Defendants argue there is no evidence supporting Plaintiff's retaliation claim against Mendoza. (Doc. 87, at 16). Plaintiff responds he "properly pled a claim of retaliation and provided a sworn statement as evidence." (Doc. 90, at 13). However, the Court did not previously rule on

the sufficiency of this claim at the pleading stage. Rather, the Court stated: "Defendants do not address this claim in their motion to dismiss, *see* Doc. 49, at 12-13, and therefore neither does the Court." (Doc. 73, at 22). Plaintiff cites his sworn statement but does not explain how it creates a genuine dispute as to either an adverse action or a causal connection between his protected conduct and Mendoza's alleged comment. (Doc. 90, at 13); *see Thaddeus-X v. Blatter*, 175 F.3d 378, 388-89 (6th Cir. 1999) (en banc) (explaining a plaintiff opposing summary judgment must produce sufficient evidence to support a jury verdict).

Even considering the evidence Plaintiff cites, his retaliation claim fails. Plaintiff's sworn statement provides in July 2021, he filed grievances and a civil complaint against several prison officials, including Mendoza. (Doc. 27-1, at 9). It further states during the same month, Mendoza "humiliated" him in the C-Side hallway concerning the Tate assault. *Id.* The statement does not identify when either event occurred or establish which occurred first. *Id.* The Amended Complaint provides additional detail, alleging Mendoza said loudly, "yeah I love inmate Tate because he fucks people up." (Doc. 27 at 13-14). Plaintiff states the comment embarrassed him and hurt his feelings. *Id.* at 14.

Assuming *arguendo* Mendoza made the comment after Plaintiff filed the grievance or civil complaint, the singular verbal comment does not constitute an adverse action. (Doc. 27, at 13-14). Plaintiff does not allege Mendoza threatened him with future harm, disciplined him, or interfered with his ability to file grievances or pursue his lawsuit. *See id.* Although Plaintiff states the comment embarrassed him and hurt his feelings, an adverse action must be one "that would deter a person of ordinary firmness from continuing to engage in" the protected conduct. *Thaddeus-X*, 175 F.3d at 394.

For these reasons, Plaintiff has not identified evidence sufficient to create a genuine dispute of material fact on his First Amendment retaliation claim against Mendoza.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion for Summary Judgment (Doc. 87) be, and the same hereby is, GRANTED.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 30, 2026